IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,                    CASE NO.: 1:18-cr-4-MW-GRJ

       Plaintiff,

vs.

MIKA KAMISSA HARRIS, <u>et. al.</u>

       Defendant.

_____/

**<u>ATTORNEY GILBERT A. SCHAFFNIT, ESQUIRE'S, d/b/a/ LAW OFFICES
OF GILBERT A. SCHAFFNIT, MOTION TO WITHDRAW AS COUNSEL
OF RECORD; MOTION TO WAIVE FOURTEEN (14) DAY NOTICE
REQUIREMENT PURSUANT TO LOCAL RULE 11(H)(2), RULES OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF FLORIDA (REVISED NOVEMBER 2015); CERTIFICATE OF
COMPLIANCE WITH LOCAL RULES 7.1(B) and 7.1(G) RULES OF THE
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF FLORIDA (REVISED NOVEMBER 2015); INCORPORATED
MEMORANDUM OF LAW IN SUPPORT THEREOF</u>**

       **COMES NOW GILBERT A. SCHAFFNIT**, **ESQUIRE, d/b/a/ LAW
OFFICES OF GILBERT A. SCHAFFNIT**, ("undersigned counsel"), and
respectfully moves this Honorable Court pursuant to Local Rules, 7.1(B) and
7.1(G)(3); 11.1(F); and 11.1(H)(2), <u>General Rules of the United States District Court,
Northern District of Florida</u> (Revised November 2015) and Rules 4-1.6(b)(3) and 4-
6.2(c) of the <u>Rules of Professional Conduct of the Rules Regulating the Florida Bar</u>, to
withdraw as counsel of record and as grounds therefor states as follows:

# I. BRIEF HISTORY RELATING TO RETENTION AND APPOINTMENT OF COUNSEL ON BEHALF OF DEFENDANT MIKA KAMISSA HARRIS

1. On February 22, 2018 a Grand Jury sitting in the Northern District of Florida, Gainesville Division, let an Indictment charging **MIKA KAMISSA HARRIS** ("**HARRIS**") with Count 1: Attempt and Conspiracy to Commit Mail/Wire Fraud in violation of Title 18, United States Code, §1343 and Healthcare Fraud in violation of Title 18 United States Code, § 1347; Counts 2-49, Healthcare Fraud in violation of Title 18 United States Code, §1347 and §2; and Counts 50 through 90, Money Laundering in violation of Title 18 United States Code, §1957 and §2.

2. That also on February 22, 2018 the Government filed various Notices of Lis Pendens as to real and personal property potentially the subject to forfeiture by the United States in the event of a conviction as to **HARRIS**. (DOC 8,9).

3. That as a result of the Government's action freezing **HARRIS'** funds, **HARRIS** was compelled to execute a CJA 23 financial affidavit and seek appointment of the Office of the Federal Public Defender pending a Hearing as to the availability of assets to retain counsel (DOC 12, 13).

4. That at a date and time unknown to undersigned counsel, but immediately after the execution of a search warrant upon **HARRIS'** residence and the business known as Reliant Family Practice ("RFP"), **HARRIS** privately retained the services of David M. Garvin, PA, Miami, Florida ("GARVIN").

5. That at some point prior to the rendition of the within Indictment, **HARRIS** became dissatisfied with the services being rendered by GARVIN and contacted undersigned counsel for the purpose of retaining undersigned counsel within the period authorized for the entry of a permanent appearance after Arraignment pursuant to Local Rule, 11.1(I)(1), <u>General Rules of the United States District Court, Northern District of Florida</u>. *See* GARVIN'S Motion (DOC 61, Paragraphs 11 and 12).

6. That during the brief period between the rendition of the Indictment herein and the permanent appearance of undersigned counsel pursuant to his appointment under the Criminal Justice Act, 18 <u>United States Code</u> 3006(A) (DOC 67), undersigned counsel and GARVIN engaged in multiple discussions with the Assistant United States Attorney then assigned as lead counsel for the Government, Tiffany Hope Eggers, ("EGGERS") Esquire with the objective of stipulating as to the release of funds to permit **HARRIS** to privately retain undersigned counsel, GARVIN, or both to represent **HARRIS** in the above referenced matter.

7. That on April 19, 2018 the Honorable Mark E. Walker, United States District Court Judge, scheduled a hearing in Tallahassee, Florida in connection with **HARRIS'** Motion for "Order Directing the United States to Unfreeze a Portion of Her Property to Enable Her to Retain Legal Counsel."(DOC 46)**.**

8. Immediately prior to the Hearing conducted on April 19, 2018 in Tallahassee, Florida GARVIN filed his Notice of Intent to Not File a Permanent Appearance or, in the Alternative, a Motion to Withdraw, based, in part, on his deteriorating relationship with **HARRIS** and citing "irreconcilable differences." (DOC 61, Paragraphs 11 and 12). GARVIN'S Motion was granted by Judge Walker immediately prior to the commencement of the Hearing concerning the release of funds. (DOC 62).

9. That on April 19, 2018 the Court entered its Order denying, without prejudice, **HARRIS'** Motion for Release of Funds. (DOC 63).

10. That as a result of the Court Order, **HARRIS** was given access to certain funds to retain counsel. However, **HARRIS** was unable to obtain the funds from the lending institution in possession of same.

11. That upon being notified of same, Judge Walker excused the Government from the Hearing and immediately conducted an *ex-parte* proceeding concerning the determination of **HARRIS'** indigency status in light of the Court's Order, and further determining under what conditions **HARRIS** would receive the benefit of the appointment of counsel under the Criminal Justice Act, 18 United States Code §3006A.

12. That as a result of the *ex-parte* Hearing the Honorable Mark E. Walker entered an Order sealing the transcript of the *ex-parte* Hearing, declaring the case

extended and complex, and further declaring **HARRIS** indigent for purposes of the appointment of counsel. (DOC 64).

13. Thereafter, after consultation with undersigned counsel, Assistant Federal Public Defender, Darren Johnson filed a motion to withdraw on behalf of his Office (DOC 66), which was granted in an Omnibus Order which served to appoint undersigned counsel as lead counsel to represent **HARRIS** and Nick Zissimopulos as co-counsel (DOC 67).

14. That as a result of the Court's Omnibus Order (DOC 67) Zissimopulos and undersigned counsel filed their Notices of Appearance on May 18, 2018 (DOC 69, 70).

15. Accordingly, Zissimopulos and undersigned counsel have represented **HARRIS** since the entry of the Omnibus Order; *nunc pro tunc* April 20, 2018.

## II. BRIEF HISTORY OF CIRCUMSTANCES GIVING RISE TO THE EXISTENCE OF IRRECONCILABLE DIFFERENCES BY AND BETWEEN HARRIS, ZISSIMOPULOS, AND UNDERSIGNED COUNSEL

16. Prior to the termination of EGGERS as lead counsel for the Government on January 2, 2019, undersigned counsel and EGGERS were able to successfully resolve many pre-trial discovery matters which would have otherwise been brought to the attention of the District Court, or this Honorable Court, due to the excellent working relationship that existed between EGGERS and

undersigned counsel which was established in a previous case, <u>United States v.</u>
<u>Ona M. Colasante</u>, Case No.: 1:14-cr-10-MW/GRJ (ND Fla. 2017).

17. As a result, undersigned counsel was permitted what undersigned counsel
believed to be extraordinary access to discovery materials at a very early stage
of the proceedings.

18. The genesis of the strained relationship between undersigned counsel and
**HARRIS** began with the misperception that the cooperation between
undersigned counsel and EGGERS, which produced the early production of
Jencks Act materials which included all of the Grand Jury testimonies of
Government witnesses excluding those of the lead Government FBI Agent,
was somehow a product of undersigned counsel's unwillingness to vigorously
and zealously advocate on **HARRIS'** behalf.

19. **HARRIS**, for her part, was born in Israel and had never experienced any
aspect of the criminal justice system in any capacity either in state or federal
Court. Moreover, although intelligent and completely fluent in the English
language, legal terminology was, understandably, a "foreign language" to
**HARRIS**.

20. To complicate matters, both EGGERS and subsequent Government counsel
took the position that **HARRIS**, not being a licensed physician, should not be
permitted unfettered access to discovery materials that contained protected

doctor/patient privileged information as well as private patient HIPPA

protected data.

21. As a result, the multiple scheduled meetings at undersigned counsel's office

attended by **HARRIS**, Zissimopulos, undersigned counsel, as well as various

office staff of undersigned counsel, and outside providers pursuant to *ex-parte*

Orders, were frequently disruptive and unproductive.

22. That a substantial disagreement developed between **HARRIS**, undersigned

counsel, and co-counsel concerning her access to unredacted discovery as well

as access to medical software platforms utilized by RFP for billing and

charting of patient records. Undersigned counsel attempted, without success,

to explain to **HARRIS** that much of the information sought was not within the

ambit of the United States Supreme Court decision in <u>Brady v. Maryland</u>, 373

U.S. 83 (1963) for at least two (2) reasons. First, the Government claimed not

to be in possession of the information on the third-party vendor platforms.

Second, the information related to patients whose billing was not the subject of

any of the Counts in the Indictment. Nonetheless, undersigned counsel, at

**HARRIS'** request, filed a Motion for Statement of Particulars in an attempt to

require the Government to disclose additional information regarding billing for

patients which was not charged in the Indictment. In its Order denying the

Motion for Bill of Particulars the Court stated "By seeking a bill of particulars

on these grounds, **HARRIS** seeks generalized discovery regarding uncharged conduct and the government's legal theories, which is improper. *See United States v. Roberts,* 174 F. App'x 475, 477 (11th Cir. 2006). This motion, ECF No. 158, is therefore **DENIED**."[1]

23. In addition to the differences set forth hereinabove, it is verily believed by undersigned counsel that **HARRIS** vehemently objected to the failure of undersigned counsel to set forth additional grounds for a severance of her trial from that of her co-defendant and former husband, SCHABERT, beyond those that undersigned counsel explained to **HARRIS** were legally cognizable and supported by Eleventh Circuit precedent[2]. Although undersigned counsel did file a Motion for Relief from Prejudicial Joinder and/or for Severance of Defendant's for Separate Trials, that Motion was denied as part of the District Court's Omnibus Order. (DOC 180, pp. 5-7).

24. Additionally, undersigned counsel and **HARRIS** had been unable to agree on basic and fundamental procedures to be employed at the pre-trial stage and during trial. **HARRIS** has maintained that she has a right to review and

---

[1] In its Omnibus Order (DOC 180) the Court did not Rule upon **HARRIS'** Motions relating to admission of wealth evidence (DOC 161), admission of evidence of potentially uncharged counts (DOC 163), and allegations relating to **HARRIS'** purchase of life insurance policies on the lives of RFP employees and assorted threatening statements to said employees by **HARRIS** (DOC 157). It is the belief of undersigned counsel that the District Court intends to set those Motions for evidentiary Hearing prior to trial at a time, date, and location based, in part, upon the resolution of the within Motion and co-counsel Zissimopulos' Motion to Withdraw (DOC 187).

[2] Undersigned counsel assumes this based on information communicated to undersigned counsel from sources other than **HARRIS. HARRIS** has not spoken with undersigned counsel since the Omnibus Order was entered on August 2, 2019. (DOC 180).

edit all Motions submitted on her behalf by undersigned counsel and to make corrections and additions as necessary. Most recently, **HARRIS** refused to sign Zissimopulos' Motion to Withdraw (DOC 187) unless she was permitted to add disparaging statements concerning her relationship with undersigned counsel. Undersigned counsel has attempted, with great patience, to inform **HARRIS** as to the divisions of labor as to attorneys versus clients and has repeatedly declined **HARRIS'** offer to file pleadings which cannot be legally sustained without violating the Cannon of Ethics relating to candor to the tribunal.

25. Whereas there are multiple other bases for the filing of the within Motion, suffice it to say that the conflicts and differences by and between undersigned counsel and **HARRIS** as with the differences between co-counsel and **HARRIS** appear at this juncture to be both permanent and unresolvable. However, for the reasons set forth herein below, the further elucidation of those reasons either in the within Motion, or at an evidentiary Hearing, serve no legitimate interest other than to educate the Government as to **HARRIS'** theory of defense and further educate the Government as to ways to which it can "divide and conquer".

26. Finally, the timing of the within Motion to Withdraw, while disturbing to all parties, was not able to be predicted. Although the divisions and conflicts set

forth above have existed, to some degree, for several months, the intensity of the differences and conflicts have only recently risen to the level necessitating the relief sought herein.

27. Specifically, prior to undersigned counsel filing his Notice of Unavailability (DOC 172) undersigned counsel and co-counsel met to discuss the division of trial labor and decisions were made concerning the respective role of each attorney for **HARRIS**. Since undersigned counsel was to be out of the country, and unavailable in Lebanon to be contacted via telephone, undersigned counsel was required to maintain contact with his office and his co-counsel via email.

28. Indeed, it was while undersigned counsel was in Lebanon that **HARRIS** and co-counsel Zissimopulos had a meeting that resulted in co-counsel filing his Motion to Withdraw. (DOC 187).

29. At the Hearing conducted yesterday on the Government's Motion to Determine Status of Counsel, undersigned counsel learned, for the first time, that **HARRIS**, who refused to be present at the office of undersigned counsel or co-counsel for the telephonic hearing, had apparently requested and received permission from her pre-trial services officer to travel to Tampa, Florida so that she could be present in the office of Jim Felman, Esquire to participate in the Hearing. This fact is perhaps the best illustration of the

status of the communication by and between **HARRIS,** undersigned

counsel, and her co-counsel.

### III. SUGGESTED LEGAL ANALYSIS FOR RESOLUTION OF UNDERSIGNED COUNSEL AND CO-COUNSEL'S MOTIONS TO WITHDRAW

30. In his Motion to Withdraw (DOC 187) co-counsel Zissimopulos references

the case of <u>United States v. Travers</u>, 996 F. Supp. 6 (U.S.D.Ct. S.D Fl. 1998).

In his Corrected Order granting Motion to Withdraw and Order that Defendant

Had Forfeited His Right to Counsel the Honorable Ungaro-Benages, District

Court Judge, engaged in a very thorough discussion of the considerations

bearing on the issue of the discharge of Court appointed counsel and the

potential substitution of counsel.

31. Although there are factual distinctions between Travers' case and that of

**HARRIS** (Travers was charged with a fraudulent scheme regarding VA and

FHA  mortgages and had been appointed seven (7) previous lawyers to

represent him) the Court's analysis is very instructive as to the proper

procedure to be followed in cases such as the one at bar.

32. First and foremost, Judge Ungaro-Benages clearly distinguished between the

*pro-se* Motion Travers filed to discharge counsel versus the separate Motion

the eighth (8th) Court appointed lawyer filed to Withdraw as Travers' counsel.

For the reasons set forth hereinbelow that distinction is important in that, in the

instant case, there is no *pro-se* Motion filed by **HARRIS** to discharge

undersigned counsel and co-counsel. Rather, the Motions that are before this

Honorable Court are the Motions to Withdraw filed by co-counsel (DOC 187)

and undersigned counsel.

33. In his Order, Judge Ungaro-Benages, recites the torturous history of Travers'

relationship with the seven (7) lawyers that proceeded his current attorney-

William Matthewman, Esquire[3], before addressing the various allegations

Travers made against his eighth (8th) lawyer, Mr. Matthewman.

34. To summarize, Travers filed numerous pleadings which included letters

from Travers to Matthewman which otherwise would be privileged,

relentlessly assailed Matthewman's professional competence and integrity.

*Id* at page 14. As the Court noted, unsatisfied, Travers continued as follows:

> "Then on February 11, 1998, Travers administered what he
> considered to be his *coup de grace* to Matthewman's representation: he
> filed his Omnibus Motion for    Counsel to which he attached a copy of a
> complaint he had filed in Dade County Circuit Court actually suing
> Matthewman for professional negligence. He also   told Matthewman that he
> had filed a bar complaint against him."

35. Judge Ungaro-Benages chose to address Travers' *pro-se* Motion and

Matthewman's Motion to Withdraw separately. First, Judge Ungaro-Benages

---

[3] Parenthetically, William Matthewman, Esquire and undersigned counsel have known one another since at least 1995 having both served terms as Defender Services Advisory Group (DSAG) Representatives to the Eleventh Circuit Court of Appeals as well as terms as District Panel Representatives for our respective districts. William Matthewman, Esquire was selected as a Magistrate Court Judge and currently occupies that position in the Southern District of Florida. His reputation as a preeminent criminal defense attorney at the time Travers filed his Motion was well established and fully set forth in Judge Ungaro-Benages's opinion.

determined that Travers' allegations of incompetence against Matthewman were unfounded and the Court specifically found that "Matthewman had been diligent and had made every good faith effort to effectively represent Travers, but that Travers had frustrated his attempts to do so." *Id* at p. 14. Accordingly, the Court denied Travers' Motion to Discharge Matthewman and substitute a different CJA lawyer of Travers' choosing. *Id* at 12. Thereafter, the Court noted that in Matthewman's Motion to Withdraw and Renewed Motion to Withdraw Matthewman made credible allegations that Travers insisted on pursuing objectives that Matthewman found to be repugnant and that Matthewman could not competently represent Travers based upon Travers refusal to cooperate with Matthewman and Travers' publicly expressed disparagement of Matthewman's professional competence and personal integrity. *Id.*

36. Respectfully, the remainder of the opinion addressing the issue of Travers' forfeiture of his Sixth Amendment right to counsel is not relevant to the within proceedings.

37. Nevertheless, as noted, above the Travers case is highly instructive. First, Travers stands for the proposition that while an evidentiary hearing may be required to establish, or not, the allegations made by a *pro-se* defendant as to the competence and professionalism of his Court appointed counsel, such an

evidentiary hearing is not required as to counsel's Motion to Withdraw where counsel's Motion sets forth, with required particularity, the legal and ethical bases for withdrawal.

38. Thus, the issue of whether undersigned counsel's Motion to Withdraw should be granted is separate and apart from any allegations which <u>could</u> be made by **HARRIS** in support of an unfiled motion for discharge and is further separate from the issue of whether **HARRIS** should be appointed substitute counsel in the event present counsel is permitted to withdraw and whether, in light thereof, the case must be continued to accommodate newly appointed counsel. <u>United States v. Llanes</u>, 374 F. 2d 712, 717 (2nd Cir. 1967); ("Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay")

39. The Government has previously made known its objection to the within case being further continued. The Government is certainly within its rights to weigh in on whether the case should be continued based upon the Court's ruling with respect to the within Motion to Withdraw and co- counsel's Motion to Withdraw. (DOC 187). Additionally, the Government has an interest in avoiding any abuse of the system that might be attendant to multiple attempts by a defendant to substitute counsel. *See*, <u>Holloway v. Arkansas</u>, 435 U.S. 475, 484-488 (1978).

40. To a lesser extent the Government may even have a valid interest in ensuring that public funds are well spent as it relates to the appointment of substitute counsel to represent **HARRIS**.

41. However, aside from those legitimate concerns, the Government's interest in the details concerning the irreconcilable conflicts and differences between **HARRIS** and her counsel is limited. Unnecessary and unwarranted disclosure of the details concerning the irreconcilable conflict that exists in the relationship between **HARRIS** and her counsel inevitably serves to invade the sanctity of the attorney/client privilege and only serves to educate the Government as to the potential defenses explored during protected communications.

42. Indeed, as the *dicta* in <u>Holloway v. Arkansas</u>, 435 U.S. 475 (1978) notes, conflicts of interest as set forth by attorneys as officers of the Court require deference as to the revelation details which could compromise the interests of the client. *Id.* at 486. Thus, while the explicit holding in <u>Holloway v. Arkansas,</u> *supra* does not preclude a trial Court from exploring the adequacy for defense counsel's representations, the Court should be ever mindful of the concern that such disclosure may improperly invade the confidential communications between a lawyer and his or her client. *Id* at 487.

## IV. SUGGESTED FRAMEWORK FOR NON-LEGAL ANALYSIS OF THE RESOLUTION OF THE MOTIONS TO WITHDRAW

43. As noted above, **HARRIS** has not filed any pro-se Motion seeking discharge of undersigned counsel, or co-counsel, on grounds of competency or adequacy of representation. Instead, what is before the Court are two (2) separate Motions to Withdraw each filed by officers of the Court. The allegations of those Motions set forth a clear and concise basis for the Court to permit the withdrawal of counsel based upon the irreconcilable differences between **HARRIS** and her Court appointed counsel as well as the complete and total breakdown in communication between **HARRIS** and her Court appointed counsel as well as the myriad of third-party vendors appointed by the Court to assist **HARRIS** in the preparation of her defense all at public expense. 18 United States Code §300A.

44. Thus, it is respectfully suggested that a "who's at fault" analysis serves no purpose in resolving the issues before the Court. Indeed, were the Court to hear the lurid details of the bases for **HARRIS'** conflict with counsel, and vice-versa, and then ultimately deny either or both of the Motions to Withdraw, the inevitable added acrimony attendant to the public revelation of those heretofore private disputes will likely only exacerbate the hostility

and lack of communication going forward, through trial, and perhaps beyond.

45. Thus, instead, counsel respectfully suggests a model for resolving the Motions to Withdraw that is based more upon a "no fault" approach. Under this approach, **HARRIS** and her respective current Court appointed counsel have stipulated that irreconcilable differences exist that preclude the existence of relationship necessary to render effective assistance of counsel[4].

46. There is ample precedent for the existence of a no-fault approach to this matter in the context of other areas of interpersonal dispute in the context of the legal system.

47. As a result of the inordinate time and expense associated with the litigation of minor traffic accidents, the Florida Legislature in 1971 passed the Florida Motor Vehicle No Fault Law. As of 2014, Florida is one of twelve (12) states that have adopted an approach which focuses on resolving liability claims without excessive litigation so that insurance costs can be lowered, and accident victims can be compensated fairly and swiftly. Colquitt,

---

[4] In the event the Court chooses to conduct an evidentiary Hearing in to the bases for the irreconcilable differences between **HARRIS** and undersigned counsel, undersigned counsel is prepared to testify at any evidentiary hearing deemed necessary by the Court. However, undersigned counsel's witnesses including his Legal Assistant, Freelance Associate, and other third-party Court appointed vendors have advised undersigned counsel that they are not available on such short notice to be present together with their documentation and provide supportive testimony.

James, "A New Crash Test:The Rise and Fall of Florida Motor Vehicle No-Fault Law"(2014). *IHM 1990-2015.* 1562. (pp. ii and 2).

https://stars.library.ucf.edu/honorstheses1990-2015/1562

48. Perhaps more analogously, in the same year, 1971, the Florida Legislature also passed the Dissolution of Marriage Act (Florida Statutes, §61.001-.20 (1975). The Act was intended to eliminate fault from Florida's "divorce" system and replace it with a statutory scheme whereby a Judgment for Dissolution of Marriage would be entered, regardless of fault, if the Court determined that the marriage was "irretrievably broken" Florida Statute, §61.052(1)(1975).

49. Although criticized as a "divorce by consent" that might endanger social stability, the conversion to a "no fault" standard abolished the acrimonious litigaton surrounding recognized defenses of recrimination, adultry, condonation, collusion, and laches. Florida Statute, §61.044(1975).

50. Thus, under the new "no fault" standard it became irrelevant whether one party or both agreed to the specifics for the dissolution saving countless hours of judicial effort and promoting goodwill that would inevitably benefit innocent third parties *to wit:* minor childen.

51. Accordingly, whether the marriage started out as one based on love or convenience or whether the marriage endured solely due to economic

circumstances or the existence of minor children, the elimination of the requirment to prove fault paid great dividends to the Court system.

52. In the instant case, when **HARRIS** became dissatisfied with GARVIN, and vice-versa, there was no extended inquiry into the bases for GARVIN'S withdrawal for two (2) reasons. First, the case was brand new and substitution of counsel could occur without prejudice to anyone; and, Second, there was an attorney (undersigned counsel) who was willing to accept responsibility for defending the case under the limitations imposed by the Criminal Justice Act. 18 United States Code §3006A.

53. Nonetheless, for many reasons, some of which are outlined hereinabove, the relationship between **HARRIS** and her counsel is irretrievably broken and a dissolution of the relationship should be granted irrespective of a determination of fault as to either party.

54. **HARRIS** has consented to the withdrawal of co-counsel and has instructed undersigned counsel to file the within Motion as well. After receving co-counsel's Motion to Withdraw, undersigned counsel reached out to **HARRIS** to offer one last opportunity to outline a set of cirmcumstances by which understanding counsel could continue to represent **HARRIS** and obtain substitute co-counsel either from the exisiting CJA panel, or as *pro hac vice* co-counsel in the event the Court were to grant co-counsel's

Motion. **HARRIS** responded by declining undersigned counsel's invitation to continue as her counsel; instead instructing counsel to file the within Motion.

### V. MOTION TO WAIVE FOURTEEN (14) DAY NOTICE REQUIREMENT PURSUANT TO RULE 11.1(H)(2); GENERAL RULES UNITED STATES DISTIRCT COURT, NORTHERN DISTRICT OF FLORIDA

55. Pursuant to the Local Rule entitled "Withdrawing In A Case," an attorney may not move for leave to withdraw without first giving fourteen (14) days notice to the client unless giving notice to the client is impossible. The Motion must set out the client's position on the Motion. As noted in the Hearing conducted yesterday on he Government's Motion for Hearing on Status of Counsel, co-counsel Zissimopulos informed Harris of his intent to file a Motion to Withdraw on August 9, 2019. On the same day, undersigned counsel advised **HARRIS** of the possibility that undersigned counsel may follow suit upon his return to the United States. With the permission of **HARRIS**, the District Court waived the fourteen (14) days notice as it relates to co-counsel's Motion. As noted above, **HARRIS** instructed undersigned counsel this morning to file the within Motion. Accordingly, undersigned counsel respectfully requests that the fourteen (14) day notice be waived in order to permit a prompt resolution of the issue pertaining to the status of **HARRIS'** counsel

## VI.  STATEMENT OF CONSULTATION

That pursuant to Local Rule 7.1(B), 7.1(C), <u>Rules of the United States District Court for the Northern District of Florida</u>, (Rev. 11/24/2015), I hereby certify that at the telephonic hearing held on August 19, 2019 the Government stated it was opposed to any Motion to Withdraw if it would require a continuance of the trial date.

## VII.  CERTIFICATE OF COMPLIANCE
## MEMORANDUM OF LAW

That pursuant to Local Rule 7.1(G)(3), <u>Rules of the United States District Court for the Northern District of Florida</u>, (Rev. 11/24/2015), I hereby certify that the within document does not require a Memorandum of Law. Nonetheless, one was incorporated herein.

## VIII.  CERTIFICATE OF COMPLIANCE
## TYPE/VOLUME LIMITATION

That pursuant to Local Rule 7.1(F),  <u>Rules of the United States District Court for the Northern District of Florida</u>, I hereby certify that this Motion complies with the type-volume and word limitation of 8,000 words in that this Motion has been written in 14 point Times New Roman font and contains 4,863 words.

## VIIII. CONCLUSION

Undersigned counsel and co-counsel have represented **HARRIS** since their respective appointment on May 10, 2018 *nunc pro tunc* April 20, 2018. During

the time undersigned counsel and co-counsel have represented **HARRIS**,

**HARRIS** insists on pursuing objectives that undersigned counsel considers

either repugnant, imprudent or both. Rule 4-4.16(d)(3), <u>Rules of Profession</u>

<u>Conduct of the Rules Regulating the Florida Bar</u>. The breakdown in

communication which has existed to some degree for several months has now

progressed to an absence of communication. Therefore, it is in **HARRIS'** best

interest that undersigned counsel and co-counsel be permitted to withdraw so

that **HARRIS** can proceed to trial with counsel in whom she has greater

confidence, and with whom she can communicate.

Respectfully submitted,

*/s/ Gilbert A. Schaffnit*

GILBERT A. SCHAFFNIT, ESQ.
719 Northeast First Street
Gainesville, Florida   32601
352-378-6593/352-374-4998 fax
gaslaw@gmail.com
Florida Bar No: 249769
Counsel for **HARRIS**

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by Electronic Filing to F.T. WILLIAMS, ESQUIRE, US Attorney, 300 E. University Ave., Gainesville, FL 32601,  JUSTIN MICHAEL KEEN, ESQUIRE Assistant United States Attorney, 111 N. Adams Street, Suite 400, Tallahassee, FL, 32301, DAVID A. WILSON, ESQUIRE, Law Offices of David A. Wilson, 201 SW 2nd Street, Suite 101, Ocala, FL 34471-1108, NICK ZISSIMOPOLOUS, ESQUIRE, Glassman & Zissimopolous, PLLC, 804 NW 16th Avenue,  Unit B, Gainesville, FL 32601-4012; and to Mika Kamissa Harris via email on this 20th  day of August, 2019.

Respectfully submitted,

/s/ *Gilbert A. Schaffnit*
Gilbert A. Schaffnit, Esquire
Counsel for **HARRIS**