IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO:  1:18cr4-AW-MAL
                                                        1:21cv154-AW-MAL

MIKA KAMISSA HARRIS,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on Defendant Mika Kamissa Harris's

Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by

a Person in Federal Custody. ECF No. 421. The Government responded in

opposition and Ms. Harris filed a reply. ECF Nos. 426, 430. After review of

the record and relevant law, the undersigned recommends that the section

2255 motion be denied without an evidentiary hearing because Ms. Harris has

failed to state a valid claim for relief for a *Brady*[1] violation and has failed to

state a valid claim for relief for ineffective assistance of counsel.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[H]old[ing] that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

## BACKGROUND

On February 22, 2018, Ms. Harris was charged in a 90-count indictment with health care fraud and money laundering crimes stemming from the operation of Reliant Family Practice in Gainesville, Florida. ECF No. 1. The crimes were alleged to have occurred from approximately January 1, 2013, through July 31, 2016. *Id.* In Count 1, Ms. Harris was charged with conspiracy to commit healthcare fraud in violation of Title 18, United States Code, Sections 1343, 1347, and 1349. *Id*. In Counts 2-49, Ms. Harris was charged with substantive counts of healthcare fraud in violation of Title 18, United States Code, Sections 1347 and 2. *Id.* In Counts 50-90, Ms. Harris was charged with money laundering in violation of Title 18, United States Code, Sections 1957 and 2. *Id.* Also charged in the indictment (in Counts 1, 8-9, 14-15, 20-27, 32-39, and 46-49) was Dr. Erik Schabert, Ms. Harris's former husband.

Ms. Harris was represented during the trial phase of the case by attorneys Gilbert A. Schaffnit and Nick Zissimopulos. ECF No. 67. After a three-week trial that lasted from October 7-30, 2019, Ms. Harris and Dr. Schabert were convicted on all counts.

On November 13, 2019, attorney James E. Felman filed a joint stipulation for substitution of counsel to represent Ms. Harris. ECF No. 304.

2

After a hearing on November 20, 2019, the court approved the substitution and allowed Mr. Felman to be substituted as counsel of record for Ms. Harris, and relieved Mr. Schaffnit and Mr. Zissimopulos from further obligations in the case. ECF No. 312.

On January 31, 2020, the court sentenced Ms. Harris to 90 months' incarceration followed by 3 years of supervised release as to each count, to run concurrently with one another. ECF No. 381. This sentence was a significant downward variance from the guideline range, which was 135-168 months, and took into consideration certain mitigating factors such as Ms. Harris's lack of criminal history and the significant collateral consequences of her conviction. ECF No. 388 at 124-26; ECF No. 382. She was also ordered to pay $4,471,572 in restitution. ECF No. 382 at 4.

On appeal, Ms. Harris argued the trial court abused its discretion by conducting a joint trial with her and Dr. Schabert together and denying her motions for severance and mistrial. *United States v. Harris*, 828 F. App'x 611 (11th Cir. 2020). The Eleventh Circuit Court of Appeals found no abuse of discretion and affirmed her convictions on September 29, 2020. The mandate issued October 28, 2020. ECF No. 412.

## DISCUSSION

In her section 2255 motion, Ms. Harris raises two grounds for relief. First, Ms. Harris argues the Government violated her due process rights under *Brady* by failing to disclose the United States Attorney Office in Vermont's investigation and prosecution of Practice Fusion, a cloud-based electronic health records company, for accepting kickbacks and misrepresenting the capabilities of its electronic health records software. ECF No. 421 at 4, 21. Second, Ms. Harris argues she was denied the right to effective assistance of counsel at trial and on direct appeal. *Id*. at 5, 42, 62. She claims her trial attorneys did not investigate her case and provide her with professional legal advice, they failed to call certain witness, and they failed to correctly advise her regarding her right to testify. *Id.* at 42. She claims that her appellate attorney should have argued that conducting a joint trial "was a Fifth Amendment violation under the Due Process Clause" and he should have raised the *Brady* issue on direct appeal. *Id.* at 63.

### 1. Ground One—*Brady* Issue

Ms. Harris contends her due process rights were violated by the Government's failure to disclose information about the investigation of Practice Fusion. She first learned about the Vermont prosecution of Practice

Fusion through a letter dated October 15, 2020, from her former trial lawyer, Gilbert A. Schaffnit. ECF Nos. 421 at 20, 421-1 at 3-4. Mr. Schaffnit advised Ms. Harris that "on Monday, January 27, 2020 the United States Department of Justice (DOJ) Office of Public Affairs, released a three (3) page press release announcing the fact that Practice Fusion, which had been the subject of lengthy federal criminal investigation, agreed to execute a deferred prosecution agreement that required payment of one-hundred eighteen point six (118.6) million dollars to the federal Government and twenty-six (26) million dollars in criminal fines and forfeitures." ECF No. 421-1 at 3. The Government followed up with its own disclosure by letter dated November 2, 2020, advising Ms. Harris's appellate lawyer, James E. Felman, of the prosecution of Practice Fusion. ECF No. 421-1 at 5. On November 4, 2020, Mr. Felman sent a letter to Ms. Harris, forwarding the information he received from the Government. ECF No. 421-1 at 2. By that time, however, Mr. Felman was no longer representing Ms. Harris and he was simply passing the information on to her. *Id.*

### a. Practice Fusion

According to a January 27, 2020, criminal information filed in the District of Vermont, Practice Fusion "provided EHR [electronic health record]

services to tens of thousands of active healthcare provider users in the United States, including in Vermont, and its software was used during millions of patient encounters each month." ECF No. 426-1 at ¶ 15. Practice Fusion offered its EHR services to healthcare providers for free. *Id* at ¶ 16. It made money by selling clinical decision support (CDS) alerts to pharmaceutical companies. *Id.* at ¶ 16. The CDS alerts were incorporated into Practice Fusion's EHR software and designed to prompt doctors to prescribe medication. *Id.* at ¶ 1.

Practice Fusion developed a "Pain CDS" which "suggested treatments, including opioids, without regard to the medical appropriateness of each option." *Id.* at ¶ 1. Its objective was to address "Pharma Co. X's economic concerns regarding providers prescribing fewer and lower dosages of opioids" given "heighted public awareness of the dangers of opioid use." *Id.* at ¶ 31. In developing the Pain CDS, Practice Fusion ignored guidelines issued by the Centers for Disease Control and recommendations in the New England Journal of Medicine regarding the use of extended-release opioids. *Id.* at ¶¶ 83-88. "Pharma Co. X's marketing personnel, who lacked expertise in administering and prescribing opioids, were involved in decisions relating to key functionalities of the Pain CDS …." *Id*. at ¶ 90.

Count 1 of the information charges Practice Fusion with conspiring with Pharma Co. X in a kickback scheme "to solicit, and receive remuneration in return for recommending and arranging for the ordering of extended-release opioids, including Pharma Co. X's products, with such orders being paid for in whole or in part under a Federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(1) & (b)(2)." *Id.* at ¶ 118. Count Two of the information alleges a substantive violation of the anti-kickback law, based on Practice Fusion's actions in soliciting and receiving renumeration in return for arranging and recommending the ordering of extended-release opioids, in violation of 42 U.S.C. § 1320a-7b(b)(1) & (b)(2). *Id.* at ¶¶ 131-134.

According to a January 27, 2020, press release from the Department of Justice, Practice Fusion entered into a Deferred Prosecution Agreement requiring it to "pay a criminal fine of $25,398,300 and forfeit criminal proceeds of nearly $1 million." ECF No. 421-1 at 7. As part of a civil settlement for claims tainted by the kickback arrangement, Practice Fusion agreed to pay $118.6 million to federal and state governments. *Id.* The civil settlement also resolved claims that Practice Fusion falsely obtained certification from the Office of the National Center for Health Information Technology by concealing that its EHR software "did not comply with all of

the requirements for certification." *Id.* Specifically, several versions of the software were "unable to permit a user to create a set of standardized export summaries" and "Practice Fusion required users to contact it separately to request export of this critical patient data." *Id* at 8. Additionally, Practice Fusion's software "did not incorporate standardized vocabularies as required for certification." *Id.*

### b. Analysis

"To establish a Brady violation a defendant must prove the following: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989) (cleaned up). Ms. Harris has several problems meeting this standard.

As noted in the Government's response, there were press reports about the Vermont investigation as early as January 25, 2018. ECF No. 426 at 21. The Vermont investigation occurred during a time that Practice Fusion was

being bought out by Allscripts (another EHR company). Various on-line media accounts were published about the investigation and the impact it had on the price Allscripts offered to buy Practice Fusion and possible additional costs to Allscripts for taking on Practice Fusion's liabilities. The Government lists 18 media accounts in its response. ECF No. 426-4. These accounts date from as early as January 25, 2018. Examples of a few, with links, are listed below.

- https://www.fiercehealthcare.com/ehr/practice-fusion-allscripts-doj-investigation-ehr-certification-merger-acquisition (article dated 1/25/18, last accessed 8/27/24)

- https://www.healthdatamanagement.com/articles/allscripts-to-pay-145m-to-resolve-dojs-practice-fusion-investigations (article dated 8/12/19, last accessed 8/27/24)

- https://www.wsj.com/articles/allscripts-reaches-tentative-agreement-over-federal-probes-11565385632 (article dated 8/9/19, last accessed 8/27/24)

Putting aside the matter of whether Ms. Harris could have obtained information about the Practice Fusion investigation herself through the exercise of due diligence, Ms. Harris has a larger problem. Ms. Harris cannot show the Practice Fusion evidence is favorable to her and a reasonable probability exists that the outcome of the proceedings would likely have been different had she had that information.

"Evidence is 'favorable' under <u>Brady</u> if it is exculpatory or impeaching." *United States v. Stahlman*, 934 F.3d 1199, 1229 (11th Cir. 2019) (*citing United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011)). The evidence of the investigation and prosecution of Practice Fusion in Vermont is neither exculpatory nor impeaching. It is not even relevant.

The fraudulent activity Ms. Harris was charged with involved fraudulent billing for skin-care services. It had nothing to do with clinical decision support alerts at the center of the criminal case in Vermont. It had nothing to do with the certification issues that were the subject of the civil settlement, i.e. the lack of "standardized vocabularies" or Practice Fusion requiring users to contact it separately to request standardized export summaries. ECF 421-1 at 7-8.

Judge Winsor, who was the trial judge, summarized the evidence presented against Ms. Harris as follows in an order denying posttrial motions:

> Dr. Schabert and Ms. Harris were once married. Even after they divorced, they worked together at Reliant Family Practice, a medical practice. Dr. Schabert was the sole doctor in the practice. Ms. Harris was a cosmetologist who performed superficial skin treatments, like common peels and facials. Ms. Harris was not authorized to provide skin services that insurance would cover. Dr. Schabert had a general osteopathic medicine practice and did not generally do skin services. Instead, he served as many patients' primary care physician, and he frequently performed osteopathic adjustments.

Ms. Harris aggressively pushed her skin services on Dr. Schabert's patients and others—particularly those who had Blue Cross Blue Shield (BCBS) insurance. The trial featured overwhelming evidence that BCBS and Medicare were improperly billed for services that were not rendered. More specifically, numerous insurance claims were submitted under billing codes for chemical peels and dermabrasion following diagnoses for actinic keratosis (AK). Patients for whom these billings were submitted (and often paid) testified that they did not receive the services that were billed—and that they did not suffer the affliction with which they were purportedly diagnosed. In short, patients would come in, receive superficial skin treatments performed by Ms. Harris or others, and would then have BCBS or Medicare billed for services that were not performed (and that Ms. Harris was unauthorized to perform). And somewhere along the way, those patients' records would reflect—wrongly—that they suffered from skin conditions that necessitated the treatments billed.

…

… Heather Keel testified that she, Ms. Harris, and Dr. Schabert had discussions about how to bill for skin-care services. According to Ms. Keel, Ms. Harris wanted to incorporate skin care into Dr. Schabert's business to increase insurance revenues. Ms. Keel, Ms. Harris, and Dr. Schabert had a conversation regarding what codes and diagnoses would be covered by the insurance companies, and they originally decided to bill under rosacea and acne diagnosis codes. When BCBS stopped paying those claims, Ms. Harris decided to have a conversation with Dr. Schabert herself about having to use AK as the diagnosis. AK was subsequently billed as a diagnosis code for BCBS for dermabrasion, dermal chemical peels, and epidermal chemical peels.

…

There was evidence that Ms. Harris handled billing, led the effort to respond to the BCBS audit, and specifically sought out BCBS

customers to be her skin patients—with the goal of billing BCBS for her cosmetic and medically unnecessary skin services. Ms. Harris further argues that insurance billing is complex, and that may be so. But it does not mean the jury could not conclude that her actions were criminal. There was testimony that Ms. Harris suggested to at least one patient (or prospective patient) that she could get services covered through insurance that other practices could not. There was also testimony that Ms. Harris arranged for her employees to get BCBS insurance and then required those employees to obtain her skin services so that she could bill those employees' BCBS insurance for those services.

Moreover, there was also evidence that Ms. Harris at one point told her third-party billing outfit to abandon any claims for skin treatment that BCBS denied. In other words, Ms. Harris would pursue these insurance claims, but if BCBS denied them, she would rather abandon the claims rather than try to justify them.

Another witness—Linda Hopper—testified that she told Ms. Harris that they could not bill for facials. Ms. Hopper testified that when she worked for Reliant Family Practice in insurance billing, she explained to Ms. Harris what kinds of things can be billed and what can't be billed to insurance. Ms. Harris specifically asked about the possibility of billing facials, to which Ms. Hopper responded that facials were considered cosmetic and not billable. Shortly after Ms. Hopper was unable to find out if there was a code for facials, Ms. Harris fired her.

There was also testimony that Ms. Harris directed staff to make up data to support insurance claims—to put on records arbitrary number of lesions that patients supposedly suffered. Records showed patient record after patient record indicating large numbers of lesions that patients themselves testified they never had. There was ample evidence to support these convictions.

ECF No. 340 at 3-4, 6-8. *See also,* ECF No. 360 Presentence Investigation

Report at ¶¶ 12-80.

Practice Fusion had a tangential relationship to this case because Reliant Family Practice used its cloud-based EHR services to maintain electronic health records. Practice Fusion did not input any of the information in the records, but instead provided a platform to enter and store records created by Reliant Family Practice administrators.

Practice Fusion's senior manager of customer experience, Emma Johnson, gave background testimony at trial about its EHR services. ECF No. 326, Transcript at 396-429. Ms. Johnson testified about things such as the procedures for setting up an account, how doctors and administrators could access and input information, how addendums to records could be made, the layout of patient information on screenshots and printed records, and the ability to link to billing partners such as Kareo (another cloud-based company that Reliant Family Practice used for billing) to submit insurance claims. But Ms. Johnson did not testify about any first-hand information specific to Reliant Family Practice.

Still, some of Ms. Johnson's testimony was favorable to Ms. Harris. On cross examination, Ms. Johnson testified that an employee could use another's login to create a record without Practice Fusion knowing about it. *Id.* at 418. Ms. Johnson also testified that patient records that were signed and locked

13

could still be changed by an addendum. *Id.* at 403, 422. This testimony was consistent with the defense theory that it was not Ms. Harris but another employee or Dr. Schabert who was using her login to fabricate claims, a point included in the closing argument by the defense. ECF No. 336, Trial Transcript at 3125-27.

Ms. Harris argues "[t]he very fact that Practice Fusion was under criminal federal investigation was inherently favorable to the defendant." ECF No. 421 at 28. But "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). This rule applies to corporate crimes, wrongs, or acts as well. *See United States v. AseraCare, Inc.*, No: 2:12–CV–245–KOB, 2015 WL 5444124, at *4 (N.D. Ala. Sept. 15, 2015). Furthermore, under Federal Rule of Evidence 609, Practice Fusion's deferred prosecution agreement and civil settlement are likely not "convictions" that could be used for impeachment purposes. *See, e.g,, United States v. Hamilton*, 48 F.3d 149, 153 (5th Cir. 1995) (when adjudication of guilt is deferred, there is no conviction). Finally, a corporate conviction cannot be used to impeach an employee witness, like Ms. Johnson, unless that witness was "directly connected to the underlying

criminal act." *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 524 (3d Cir. 1997). There is no indication Ms. Johnson was.

Ms. Harris also argues that if the Practice Fusion investigation had been disclosed, the court likely would have ruled differently on the request for access to Practice Fusion's metadata. ECF No. 421 at 26-28. She reasons that other employees were logging into the Practice Fusion software and were providing skin care services, and she could have shown through the metadata that she was not present at those times. *Id.* The court, however, understood the nature of Ms. Harris's request for the metadata. ECF No. 318, Transcript at 50:21-24 ("I think part of what they're saying, though, is that if—if the IP address shows a physical location and she doesn't match up with that, then she would not be there either if she has the password.").[2] The Practice Fusion investigation would not have added anything to the analysis.

Moreover, the Government did not obtain Reliant Family Practice's records from a standardized export summary created by the user, which was the problem noted in the press release with Practice Fusion's certification. ECF No. 421-1 at 8. Instead, the Government obtained the records from

---

[2] The court orally denied Ms. Harris's motion (ECF No. 163) at a later hearing on September 6, 2019. ECF No. 356, Transcript at 7:10-23. No written order was issued. ECF No. 336, Transcript at 3027:18—3028:4.

Practice Fusion by search warrant. ECF No. 318 at 47:20-25 ("That's what was given to us in response to the search warrant by Practice Fusion, showing log-ins, dates, and -- and whatever activity they provided to us. And that's the extent of what we got. And we gave a copy of what -- what we got to the defense."). There is no indication that the portability requirements that were subject to the civil settlement had any effect on the records in this case.

Given these circumstances, Ms. Harris has failed to allege facts to show that the Practice Fusion information was favorable to her and that there was a reasonable probability that the outcome of the proceedings would have been different had the Practice Fusion investigation been disclosed to the defense. Accordingly, she is not entitled to relief on her *Brady* claim.

## 2. Ground Two—Ineffective Assistance of Counsel

Ms. Harris argues that she was denied the right to effective assistance of counsel both at trial and on direct appeal. ECF No. 4421 at 5, 42, 62. She claims her trial attorneys "fail[ed]to investigate the law, facts, and circumstances of [her] case, and then provide her with the professional legal advice she was entitled to in deciding on how to deal with the case." *Id.* at 42. She claims that her appellate attorney should have argued that conducting a joint trial "was a Fifth Amendment violation under the Due Process Clause."

*Id.* at 63. She also claims her appellate attorney should have raised the *Brady* issue on direct appeal. *Id.* These arguments will be addressed in reverse order.

### a. Appellate Counsel

A defendant is entitled to receive effective assistance by appellate counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). "Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel …." *Philmore v. McNeil*, 575 F.3d 1251, 1264 (11th Cir. 2009).

To prevail on a claim of ineffective assistance of appellate or trial counsel, a defendant must show: (1) her attorney's representation fell below "an objective standard of reasonableness," and (2) a reasonable probability exists that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The court may dispose of an ineffective assistance claim if a defendant fails to carry her burden on either of the two showings. *Id.* Thus, counsel is not constitutionally ineffective for failing to raise a meritless claim. *Shere v. Sec'y Fla. Dep't of Corr.*, 537 F.3d 1304, 1310 (11th Cir. 2008). Furthermore, to state a valid claim for relief, a defendant is required to "allege[] facts that if true, would entitle [her] to relief." *Winthrop-Redin v.*

*United States*, 767 F.3d 1210, 1216 (11th Cir. 2014). "'Conclusory allegations of ineffective assistance are insufficient.'" *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) (quoting *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1992)).

Ms. Harris claims Mr. Felman was ineffective for failing to raise a *Brady* claim on direct appeal. ECF No. 421 at 63. As discussed previously, Ms. Harris cannot succeed on her *Brady* claim. Therefore, Ms. Harris cannot show prejudice as a result of Mr. Felman's failure to raise the issue on direct appeal. Nor can she show deficient performance to support her claim. *See Hollis v. United States*, 958 F.3d 1120, 1124 (11th Cir. 2020) (finding counsel did not perform deficiently by failing to raise a meritless issue).

Ms. Harris also argues that Mr. Felman's argument on direct appeal regarding her joint trial with Dr. Schabert was deficient because he failed to argue "a Fifth Amendment violation under the Due Process Clause—that is that Harris was not given a fair trial as Dr. Schabert's defense was accusing her of a crime." ECF No. 421 at 63. The argument Mr. Felman raised, however, included Ms. Harris's due process claim.

Mr. Felman's initial brief argues that Ms. Harris suffered compelling prejudice from her joint trial with Dr. Schabert, in accordance with the

standard in *Zafiro v. United States*, 506 U.S. 534 (1993). Initial Brief of Appellant Mika Kamissa Harris, No. 20-10430-A, 2020 WL 1934834 at \*38-42 (Apr. 17, 2020). The Eleventh Circuit has noted, "[t]he [*Zafiro*] Court did not explicitly mention the Fifth Amendment's Due Process Clause in interpreting Federal Rule of Criminal Procedure 14. Arguably, however, the Court implicitly held that mutually antagonistic defenses also do not per se violate the <u>due process right to a fair trial</u> …." *Hardy v. Comm'r, Alabama Dep't of Corr.*, 684 F.3d 1066, 1079 n.13 (11th Cir. 2012) (emphasis supplied). The *Zafiro* Court "acknowledged that, under some circumstances, a joint trial 'might present a risk of prejudice' sufficient to warrant severance under Rule 14." *Id.* at 1079 (*quoting Zafiro* 506 U.S. at 539). This is precisely what Mr. Felman argued.

Ms. Harris's confusion comes from the portion of the Eleventh Circuit Court of Appeal's opinion in her case stating, "Harris does not contend she was denied a constitutional right …." *United States v. Harris*, 828 F. App'x 611, 613 (11th Cir. 2020). "Examples of specific constitutionally protected trial rights that might be jeopardized in a joint trial are the Sixth Amendment right to confrontation and the Fifth Amendment right to remain silent." *United States v. Lopez*, 649 F.3d 1222, 1235 (11th Cir. 2011). Ms. Harris does not

19

raise such issues, and "[t]he second-prosecutor, finger-pointing situation" she identifies, and that Mr. Feldman argued, is not something that will generally rise to the level of a constitutional violation. *Hardy*, 684 F.3d at 1079.

Nevertheless, Mr. Felman actually raised on appeal the issue Ms. Harris has identified. Therefore, Ms. Harris cannot show that she was prejudiced or that Mr. Felman performed deficiently. Accordingly, relief as to this issue must be denied.

### b. Trial Counsel

In determining whether counsel's conduct was deficient, a court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688; see also *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that [her] counsel did take." *Hollis v. United States*, 958 F. 3d 1120, 1122 (11th Cir. 2020) (citation omitted). Reviewing courts "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; see also *Chandler v. United States*, 218 F.3d 1305,

1315-16 (11th Cir. 2000) (discussing presumption of reasonableness of counsel's conduct).

To establish prejudice, a defendant must show that, but for counsel's deficient performance, the outcome of the proceeding would likely have been different. *Strickland*, 466 U.S. at 694. For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993); *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 754 (11th Cir. 2010). A defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail ... are few and far between." *Chandler*, 218 F.3d at 1313. This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted.

21

*Dingle*, 480 F.3d at 1099; *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000). Lawyers in every case could have done something more or different, and the issue is not what is possible, but only what is constitutionally compelled. *Chandler*, 218 F.3d at 1313.

As noted above, Ms. Harris claims Mr. Schaffnitt and Mr. Zissimopulos "fail[ed]to investigate the law, facts, and circumstances of [her] case, and then provide her with the professional legal advice she was entitled to in deciding on how to deal with the case. This includes failure to call certain witnesses, correctly advising Ms. Harris on whether or not to testify when she in fact desired to do so." ECF No. 421 at 42.

Ms. Harris's problems with trial counsel were subject to two hearings in the months leading up to her October 2019 trial. On August 21, 2019, Magistrate Judge Jones held a hearing on the motions filed by trial counsel to withdraw from representing Ms. Harris. Those motions were denied. ECF No. 201. Then on September 5 and 11, 2019, Judge Jones held hearings on trial counsels' second motions to withdraw. Judge Jones's findings are instructive.

After the first hearing on August 21, 2019, Judge Jones found:

> … According to Mr. Zissimopulos, the attorney-client meetings have not been productive because Defendant insists upon focusing on matters and issues not relevant to the issues counsel wants to address at the client meetings. These tangential matters include,

among other issues, previous rulings by the Court or legal issues previously addressed multiple times. Mr. Schaffnit voiced similar problems regarding his working relationship with Defendant.

Ms. Harris explained to the Court that although she did not object to the filing of the motions to withdraw she did not request counsel to withdraw. Instead, the gist of Ms. Harris' complaints to the Court focused on actions and strategies she believes counsel have not vigorously pursed. Based upon these shortcomings, Ms. Harris expressed to the Court during the ex-parte portion of the hearing, that she has lost confidence her counsel are defending her adequately.

…

… While Ms. Harris may appear to be a difficult client it is understandable that her combative nature with counsel, while counterproductive, is not such that counsel cannot continue to represent Ms. Harris in this case. Although the tensions and differences between counsel and client might be difficult—and may make representation challenging—these tensions and differences do not rise to the level of irreconcilable conflicts.

…

As discussed above, and as explained by the Court at the hearing, the Court concludes the reasons for withdrawal relate almost entirely to tensions between counsel and client and frustration on the part of counsel in their efforts to focus Ms. Harris in their meetings on issues and facts counsel believe are relevant and important.

…

… Lastly and as the Court mentioned, withdrawal of counsel and the substitution of a new legal team, would in the Court's view not solve any of the personality problems expressed to the Court at the hearing.

23

ECF No. 201 at 2-8

After the September 5 and 11, 2019 hearing, Judge Jones found:

Through no fault of Defendant's counsel, the Defendant has resisted, challenged and refused in many instances to comply with the advice and reasonable requests of her counsel, which has made the representation that much more difficult. While the Court recognizes the difficulties counsel has experienced in representing the Defendant, nonetheless, the Defendant is entitled like every criminal defendant to the effective representation of counsel. Where a defendant, however, thwarts the efforts of counsel to do their job that is the fault of the Defendant and [it] cannot serve as the impetus for withdrawal of counsel. If that was the standard for withdrawal of counsel every criminal defendant could simply delay her trial by making it difficult for her attorneys to do their job. Based upon the Court's interactions with counsel and the defendant at several hearings in this case, in the Court's view, that is exactly what is going on here.

… While there might not be a meaningful relationship between the Defendant and her court appointed counsel at this point, the Court has no doubt based upon the discussion at the hearings on these motions, that Defendant's counsel is endeavoring to provide (as best as they can under the circumstances) effective representation for the Defendant.

ECF No. 219 at 2-4. Judge Jones also ordered Ms. Harris to participate in mental health treatment and counseling. ECF No. 220.

Judge Jones's findings in his orders are amply supported by the hearing transcripts. ECF Nos. 319, 320, 350, 351, and 352. They show that Mr.

24

Schaffnit and Mr. Zissimopulus were rendering effective assistance as of September 11, 2019.

As to the matters occurring afterward and through trial, the Court notes the following. There were extensive arguments at the September 11, 2019 hearing before Judge Jones regarding three cell phones and an iPad Ms. Harris had, that were purported to contain emails and text messages favorable to the defense. ECF No. 352, Transcript at 16-48. Ms. Harris argued with Judge Jones and refused to provide the phones and iPad to Mr. Schaffnit to have them analyzed, but finally she relented. Both Mr. Schaffnit and Ms. Harris agree that she provided the devices to him on September 13, 2019, with trial set to begin on October 7. Any complaints Ms. Harris has as to the inability to examine those devices properly, or other devices Ms. Harris had, was the result of her own delay, not from ineffective assistance of counsel.

As for potential witnesses, at the September 11, 2019 hearing, Mr. Schaffnit explained that he needed to submit a witness list and Ms. Harris had not yet provided a list. *Id.* at 7. Ms. Harris said she could not provide a witness list without the EOB (explanation of benefits) forms. *Id.* at 18: 3-6. Ms. Harris eventually provided a witness list. Thereafter, trial counsel made strategic decisions regarding which witnesses to call. ECF No. 426-5 at ¶ 29; 426-7 at

¶ 13. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [the court] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).

At trial, Ms. Harris complains that she was denied the right to testify on her own behalf. A review of the trial transcript shows that Judge Winsor conducted an extensive inquiry of Ms. Harris on this matter. ECF No. 335, Transcript at 2865:14—2875:6. Although Ms. Harris complained about being subject to impeachment with statements the Government claimed she made during a proffer, she eventually acknowledged the decision to testify or not was solely up to her and that she would not be testifying. The record conclusively establishes counsel did not interfere with Ms. Harris's right to testify, and she is not entitled to relief as to this ground.

## CONCLUSION

An evidentiary hearing is not necessary to resolve Ms. Harris's claims because "the motion and files and records conclusively show that the prisoner is entitled to no relief." See 28 U.S.C. § 2255(b); *Rosin v. United States*, 786 F. 3d 873, 877 (11th Cir. 2015); *Winthrop-Redin v. United States,* 767 F.3d 1210, 1216 (11th Cir. 2014). For the foregoing reasons, the Court finds that Ms. Harris has not shown that any of the claims raised in his motion to vacate,

set aside, or correct sentence pursuant to 28 U.S.C. § 2255 have merit. Therefore, her motion should be denied in its entirety.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), § 2255 Rules.

After review of the record, the court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the court deny a certificate of appealability in its final order. The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the

attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully RECOMMENDED:

1.    The motion to vacate, set aside, or correct sentence (ECF No. 421) be DENIED.

2.    A certificate of appealability be DENIED.

At Gainesville, Florida on August 27, 2024.


s/ *Midori A. Lowry*
Midori A. Lowry
United States Magistrate Judge


## NOTICE TO THE PARTIES

The District Court referred this case to a magistrate judge to address preliminary matters and to make recommendations regarding dispositive matters. See N.D. Fla. Loc. R. 72.2; see also 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636.